## UNITED STATES  DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**CARL WATSON #113256**                              **CIVIL ACTION**

**versus**                                                          **NO. 06-613**

**N. BURL CAIN, WARDEN**                         **SECTION: "E" (3)**

### REPORT AND RECOMMENDATION

   This matter was referred to this United States Magistrate Judge for the purpose of conducting a hearing, including an evidentiary hearing, if necessary, and submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts.  Upon review of the record, the Court has determined that this matter can be disposed of without an evidentiary hearing.  See 28 U.S.C. § 2254(e)(2).[1]  Therefore, for all of the following reasons, **IT IS RECOMMENDED** that the petition be **DISMISSED WITH PREJUDICE**.

---

[1] Pursuant to 28 U.S.C. § 2254(e)(2), whether to hold an evidentiary hearing is now a statutorily mandated determination.  According to Section 2254(e)(2), the district court generally may hold an evidentiary hearing only when the petitioner has shown that either the claim relies on a new, retroactive rule of constitutional law that was previously unavailable (28 U.S.C. § 2254(e)(2)(A)(i)) or the claim relies on a factual basis that could not have been previously discovered through the exercise of due diligence (28 U.S.C. § 2254(e)(2)(A)(ii)); and the facts underlying the claim show by clear and convincing evidence that, but for the constitutional error, no reasonable jury would have convicted the petitioner (28 U.S.C. § 2254(e)(2)(B)).

Petitioner, Carl Watson, is a state prisoner incarcerated at the Louisiana State Penitentiary, Angola, Louisiana.  On October 30, 1997, he was convicted of second degree murder in violation of La.Rev.Stat.Ann. § 14:30.1.[2]  On January 14, 1998, he was sentenced to a term of life imprisonment, without benefit of probation, parole, or suspension of sentence, but with credit for time served.[3]  On June 25, 1999, the Louisiana First Circuit Court of Appeal affirmed his conviction and sentence.[4]  He then filed with the Louisiana Supreme Court an application for a writ of certiorari and/or review[5] which was denied on January 14, 2000.[6]

On January 2, 2001, petitioner filed with the state district court an application for post-conviction relief.[7]  That application was denied on July 3, 2001.[8]  He next filed with the Louisiana First Circuit Court of Appeal an application for a writ of review which was denied on December 14, 2001.[9]  In his federal application, petitioner alleges that he then filed with the

---

[2] State Rec., Vol. III of III, trial transcript, p. 502; State Rec., Vol. I of III, minute entry dated October 30, 1997.

[3] State Rec., Vol. I of III, transcript of January 14, 1998; State Rec., Vol. I of III, minute entry dated January 14, 1998.

[4] State v. Watson, No. 98-KA-1487 (La. App. 1st Cir. June 25, 1999) (unpublished); Supplemental State Rec., Vol. I of II.

[5] Supplemental State Rec., Vol. I of II.

[6] State v. Watson, 753 So.2d 208 (La. 2000) (No. 1999-KO-2075); Supplemental State Rec., Vol. I of II.

[7] Supplemental State Rec., Vol. I of II.

[8] Supplemental State Rec., Vol. II of II, Judgment dated July 3, 2001.

[9] State ex rel. Watson v. State, No. 2001-KW-1825 (La. App. 1st Cir. Dec. 14, 2001) (unpublished); Supplemental State Rec., Vol. I of II.

Louisiana Supreme Court an application for supervisory writs;[10] however, there is no evidence of such a filing or a related decision by that court.[11]

On September 30, 2002, petitioner filed with the state district court a second application for post-conviction relief.[12]  That application was denied on July 27, 2004.[13]  He next filed with the Louisiana First Circuit Court of Appeal a related writ application[14] which was denied on October 18, 2004.[15]  He then filed with the Louisiana Supreme Court a related writ application[16] which was denied on November 29, 2005.[17]

On February 4, 2006, petitioner filed this federal application for *habeas corpus* relief.[18]  In support of his application, he raises the following claims:

---

[10]  Rec. Doc. 3, supporting memorandum, p. 2.

[11]  The state court record has no copy of that filing, and this Court can find no evidence of a related decision on Westlaw.  Although petitioner attaches many such documents to his federal application, these documents are not among them.

[12]  Supplemental State Rec., Vol. II of II.

[13]  Supplemental State Rec., Vol. I of II, Order dated July 27, 2004; see also Supplemental State Rec., Vol. I of II, Written Reasons filed August 2, 2004.

[14]  Rec. Doc. 3, Exhibit B.

[15]  State *ex rel.* Watson v. State, No. 2004-KW-1846 (La. App. 1st Cir. Oct. 18, 2004) (unpublished); Supplemental State Rec., Vol. I of II.

[16]  Supplemental State Rec., Vol. I of II.

[17]  State *ex rel.* Watson v. State, 916 So.2d 157 (La. 2005) (No. 2004-KH-3215); Supplemental State Rec., Vol. I of II.

[18]  Rec. Doc. 3.

    1.   The prosecution failed to disclose exculpatory or impeachment

          evidence; and

    2.   The trial court erred by not correcting an improper jury verdict.[19]

    The state does not challenge the timeliness of petitioner's federal application.[20]

However, the state argues that petitioner failed to exhaust his state court remedies with respect to

his first claim.[21]

---

[19] On August 18, 2006, petitioner filed a "traverse" in which he indicated that wanted to amend his federal application to also assert the following claims:

    1.  Petitioner received ineffective assistance of counsel;
    2.  The prosecution challenged potential jurors for racially discriminatory reasons in violation of Batson v. Kentucky, 476 U.S. 79 (1986);
    3.  Petitioner is actually innocent;
    4.  The prosecution threatened Christopher McGary into falsely stating that petitioner shot the victim, and that the prosecution withheld that information; and
    5.  The prosecution knowingly used false evidence to obtain petitioner's conviction.

Rec. Doc. 6. However, the Court notified petitioner that it was apparent from the state court record that those five additional claims were not exhausted and, if the application were amended to add those claims, the application would be subject to dismissal as a mixed petition. See Alexander v. Johnson, 163 F.3d 906, 908 (5th Cir. 1998) ("A habeas petition containing both exhausted and unexhausted claims is a 'mixed' petition which should be dismissed without prejudice."). Accordingly, petitioner was ordered to notify the Court in writing to confirm whether (1) he still wished to amend his application to include the five additional claims or (2) he wanted to proceed on only the two claims in his original application and to withdraw his request to amend the application to include the five additional claims. Rec. Doc. 8. Petitioner subsequently notified the Court that he elected the latter option. Rec. Doc. 9. Accordingly, those five claims are not being asserted in this proceeding and will not be considered in this opinion.

[20] It appears that petitioner's federal application may in fact be untimely. However, the state failed to raise the defense and the Court is not obliged to raise it *sua sponte*. Day v. McDonough, 126 S.Ct. 1675, 1684 (2006).

[21] Rec. Doc. 5, p. 2.

- 4 -

<u>Exhaustion</u>

The United States Supreme Court has held:

> Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies, 28 U.S.C. § 2254(b)(1), thereby giving the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights. To provide the State with the necessary opportunity, the prisoner must fairly present his claim in each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting the court to the federal nature of the claim.

<u>Baldwin v. Reese</u>, 541 U.S. 27, 29 (2004) (internal quotation marks and citations omitted). Further, the United States Fifth Circuit Court of Appeals has noted:

> A federal court claim must be the "substantial equivalent" of one presented to the state courts if it is to satisfy the "fairly presented" requirement. The habeas applicant need not spell out each syllable of the claim before the state court to satisfy the exhaustion requirement. This requirement is not satisfied if the petitioner presents new legal theories or new factual claims in his federal application.

<u>Whitehead v. Johnson</u>, 157 F.3d 384, 387 (5th Cir. 1998) (footnotes omitted).

Accordingly, petitioner's claims are exhausted if he has given the Louisiana Supreme Court the opportunity to consider those claims. Upon review of the state court record, the Court finds that petitioner asserted the first claim herein in the writ application he filed with the Louisiana Supreme Court in case number 2004-KH-3215.[22] Therefore, the Court rejects the state's contention that petitioner's federal application should be dismissed on the ground that he failed to exhaust his

---

[22] Supplemental State Rec., Vol. I of II.

state court remedies with respect to that claim.[23]  Accordingly, the Court will address petitioner's claims.

<u>Standard of Review</u>

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") comprehensively overhauled federal *habeas corpus* legislation, including 28 U.S.C. § 2254. Amended subsections 2254(d)(1) and (2) contain revised standards of review for questions of fact, questions of law, and mixed questions of law and fact.  Provided that the state court adjudicated the claim on the merits, pure questions of law and mixed questions of law and fact are reviewed under § 2254(d)(1) and questions of fact are reviewed under § 2254(d)(2).  <u>Hill v. Johnson</u>, 210 F.3d 481, 485 (5th Cir. 2000).

As to questions of law and mixed questions of law and fact, a federal court must defer to the state court's decision unless it "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).   The United States Supreme Court has noted:

> § 2254(d)(1)'s "contrary to" and "unreasonable application" clauses have independent meaning.  A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts.   The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case.  The focus

---

[23]   In any event, the Court has the authority to deny the claim on the merits regardless of whether it is technically exhausted.  <u>See</u> 28 U.S.C. § 2254(b)(2); <u>Jones v. Jones</u>, 163 F.3d 285, 299 (5th Cir. 1998).

> of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in Williams[ v. Taylor, 529 U.S. 362 (2000)] that an unreasonable application is different from an incorrect one.

Bell v. Cone, 535 U.S. 685, 694 (2002) (citations omitted).

As to questions of fact, factual findings are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2); see also 28 U.S.C. § 2254(e)(1); Hill, 210 F.3d at 485.

Facts

The facts of the instant case, as summarized by the Louisiana First Circuit Court of Appeal on direct appeal, are as follows:

> On May 17, 1996, around 1:40 p.m., the Hammond Police were called to the scene of a shooting behind Hammond Junior High School. They found the victim, Ivory Quillen, lying in the middle of the street with several gunshot wounds.  An autopsy would later reveal one wound to the right hand, one in the left arm, and two in the back.  At the crime scene, police found a small handgun near the victim's body containing five spent rounds or shell casings and five additional spent rounds or shell casings on the ground around the crime scene.  Three bullets were also recovered from the victim's body during an autopsy, and two bullets were also found imbedded in the trunk and passenger door of a Nissan Altima, driven by Sammy Michelle, which witnesses would later testify the victim was standing near at the time of the shooting.  Blood spatters were also found on the Nissan's passenger door.
>
> Forensic testing showed the gun near the victim was a .38 caliber revolver and the spent casings in that gun were "thirty-eight special cartridges"; however, the bullets taken from the victim's body and the Nissan were "three eighty auto caliber bullet[s]," and the empty shell casings found on the ground were "three eighty caliber cartridge cases."  The State's weapons expert testified "thirty eight" bullets are meant to be fired in a revolver with a cylinder, like the gun

-  7  -

found under the victim, with the casings remaining in the gun after the bullets are fired.  On the other hand, "three eighty" bullets, like the kind found in the victim's body and in the Nissan, are designed for a semi-automatic handgun which ejects the casing out onto the ground after firing.  The expert also testified that the "three eighty" bullets and casings recovered by the police from the victim's body, the Nissan, and the ground at the crime scene were not fired from the .38 caliber revolver found near the victim.

The police also discussed the crime with three eyewitnesses.  Larry Parker and Michael Badon, who were with the victim at the time of the murder, identified Carl Watson, the defendant, in photo line-ups soon after the murder and informed the police defendant had been driven to and from the crime scene by Christopher McGary whom they also identified in photo line-ups.  At trial, Larry Parker testified he, the victim, and Michael Badon encountered a group of men playing a dice game while riding their bicycles on an errand to see the victim's son.  According to Parker, a person he believed to be the defendant's son, "Kendrick," stopped them because he was upset about the victim coming into his neighborhood because of something the victim had allegedly done to his father.  Later, Parker saw a person he believed to be the defendant's brother, "Antoine," give Christopher McGary a set of car keys, and McGary then left.

According to Parker, he, Badon and the victim then began to leave but were stopped by "Donald Ray" and his girlfriend who were riding in a car and who wanted to gamble with the victim.  A man named "Sam" then drove up, and the victim was on his bike between the two cars discussing with Donald Ray and Sam whether they would gamble or not.  Parker and Badon were waiting for the victim to finish his conversation when Parker saw a gray El Camino driven by Christopher McGary approaching the victim and the two stopped vehicles.  Parker then testified he saw defendant, Carl Watson, jump out of the passenger side of the car and start shooting at the victim with a gun that sounded like an automatic.  Parker also testified he called the police as soon as he got home.

Michael Badon testified at trial.  He testified that he, the victim, and Parker were riding bikes to a different part of town to see the victim's baby.  They ran into some men playing dice.  At some point, Badon and Parker waited while the victim was sitting on his bike between two stopped cars talking with the occupants of the cars, Sammy Michelle and Donald Ray.  Badon saw a gray El Camino drive up and defendant emerge shooting at the victim.  Defendant then shot the victim several times.  Another man was driving the El

Camino.  He later identified, through photo line-ups, the driver as Christopher McGary and the shooter as Carl Watson.

At trial, the State introduced the testimony of Christopher McGary as well as two prior statements written by him.  McGary had initially been arrested as a principal to second degree murder.  While in jail, McGary gave his first written statement in which he wrote that Carl Watson saw him walking by his house and asked McGary to drive him to the store.  On the way to the store, according to the first statement, they saw a dice game, and while McGary was parking the car, Watson got out and went around the corner.  McGary heard gunshots and saw Watson run back to the car with a gun in his hand.  McGary then drove Watson home.  In exchange for this statement, the charges against McGary were reduced, and he pled guilty to being an accessory after the fact in violation of La. R.S. 14:25 for which he received probation and a suspended sentence.

Later, McGary told a different new assistant district attorney, who had begun handling the case, that his first statement was not entirely truthful, and McGary wrote a second statement.  In the second statement, McGary wrote that Antoine Watson had given him his car keys and asked him to go and get Carl Watson.  He brought defendant back to the dice game where defendant "shoot and kill Magoo [the victim's nickname] [sic]" and then jumped in the car with a gun and told McGary to drive him home.

At trial, McGary gave a similar but much more detailed story.  After eating crawfish with his girlfriend and Lashawn Smith, at Carl Watson's house, McGary had the two girls drop him off near the location where the dice game was being played.  While he was at the game, he saw Larry Parker, Michael Badon and the victim arrive on bicycles, and he saw one of them get into an argument with someone at the game.  According to McGary, after the argument, defendant's nephew, Antoine Watson, gave him the keys to his gray El Camino and told him to go and pick up Carl Watson.  Upon returning with defendant and letting him out of the car, McGary heard shots while he was parking the car.  Watson reentered the car, carrying a gun, and McGary drove Watson home.

During his testimony, McGary explained his first statement was not entirely truthful because he was "nervous" and wanted to get out of jail, but that in his two statements and his testimony, he consistently told the truth as to his driving Watson to the scene of the crime and Watson reentering the car carrying a gun after the shots were fired.  Additionally, on cross-examination, McGary admitted that although in both written statements he said he left the car at Carl

Watson's home and walked home after the murder, he in fact dropped Carl Watson off and then returned the car to Antoine Watson.

The defense introduced the testimony of one impeachment witness and three alibi witnesses. First to testify was Lydia Watson, defendant's sister, who testified that Larry Parker had shot her brother some time before the instant shooting. On cross-examination, she stated she did not report the shooting to the police until one month prior to her brother's trial even though she testified she was afraid Parker would try to hurt her since she had been a witness to the shooting.

Mary Moore was defendant's fiancée and was living with her mother and defendant at the time of the murder. She testified defendant had been shot three weeks before and was being taken care of by her mother, and that she, defendant and some friends were together eating crawfish until the police arrived. On cross, Moore testified she had a child with defendant and that she loved him. She also admitted that she had been telling the truth, in a taped statement given to police the day of the murder, when she had said she went to straight to bed after returning from school around noon and that she did not get out of bed until 3:00 that afternoon. Confusingly, she then stated Carl had been in bed with her and he had not eaten any of the crawfish. Later in her testimony, she said she was outside from 12:00 noon to 3:00 p.m. and that she did not know what he as doing during that time.

Emma Jean Felder testified she is Mary Moore's mother and that Moore and defendant have a "common-law" marriage. She said she lay inside on the couch watching television most of the day, she was sick and Carl took care of her, and Carl did not leave the house at all that day. On cross, she admitted Carl had been outside during some part of the day eating crawfish and drinking beer and she did not know what his actions were while he was outside.

Finally, Lashawn Smith testified that she, Christopher McGary, her friend Tina, and Carl were at Carl's house from noon until about 2:30 shooting dice, that they took a brief trip to the store for food, and then returned to the house until around 4:00 p.m. when the police arrived to question Carl. On cross, Smith said she was presently serving time for theft convictions and that she never felt the need to let the police know the information she had.

Defendant did not testify.[24]

<u>Brady Claim</u>

Petitioner claims that the prosecution withheld exculpatory or impeachment evidence, i.e. statements by Connie Bentley and George McCray, in violation of <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), and its progeny.[25]  The United States Supreme Court has held:

> A <u>Brady</u> violation occurs when the government fails to disclose evidence materially favorable to the accused.  This Court has held that the <u>Brady</u> duty extends to impeachment evidence as well as exculpatory evidence, and <u>Brady</u> suppression occurs when the government fails to turn over even evidence that is known only to police investigators and not to the prosecutor.  Such evidence is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different, although a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal.  The reversal of a conviction is required upon a showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.

<u>Youngblood v. West Virginia</u>, 126 S.Ct. 2188, 2190 (2006) (per curiam) (internal citations and quotation marks omitted).  Therefore, to prevail on a <u>Brady</u> claim, the petitioner "must show that (1) the state withheld evidence, (2) the evidence was favorable to the accused, and (3) the evidence is material to guilt or punishment."  <u>DiLosa v. Cain</u>, 279 F.3d 259, 262-63 (5th Cir. 2002).

---

[24]  <u>State v. Watson</u>, No. 98-KA-1487, pp. 2-7 (La. App. 1st Cir. June 25, 1999) (unpublished); Supplemental State Rec., Vol. I of II.

[25]  In its response, the state more expansively interprets petitioner's claim.  However, a careful reading of petitioner's application makes clear that his claim involves the alleged suppression of the statements of Bentley and McCray.

When petitioner asserted the instant <u>Brady</u> claim in his state post-conviction proceedings, the state district court rejected the claim, holding:

> A review of petitioner's ... allegations alleges a violation of <u>Brady v. Maryland</u>.  In reviewing the statements attached to his alleged application, I find no reasonable probability that the original outcome of the jury would have been undermined in any fashion if these statements had been furnished to petitioner's counsel.  For purposes of argument, I am assuming that these statements were not furnished to petitioner's counsel, although that fact may well be disputed.[26]

Both the Louisiana First Circuit Court of Appeal and the Louisiana Supreme Court likewise denied the claim.[27]  Because a <u>Brady</u> claim presents a mixed question of law and fact, this Court is required to defer to those state court decisions unless they are "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1); <u>Trevino v. Johnson</u>, 168 F.3d 173, 184 (5th Cir. 1999).

In this claim, petitioner argues that the state wrongly withheld the statements given to Detective Grob on May 17, 1996, by Connie Bentley and her boyfriend, George McCray, who arrived on the murder scene in their vehicle after the incident occurred.[28]  Petitioner argues that the defense should have been provided with those statements because they are inconsistent with the trial testimony of Christopher McGary, Larry Parker, and Michael Badon.

---

[26]  Supplemental State Rec., Vol. I of II; Written Reasons filed August 2, 2004.

[27]  <u>State ex rel. Watson v. State</u>, No. 2004-KW-1846 (La. App. 1st Cir. Oct. 18, 2004) (unpublished); <u>State ex rel. Watson v. State</u>, 916 So.2d 157 (La. 2005) (No. 2004-KH-3215); Supplemental State Rec., Vol. I of II.

[28]  Copies of the statements are included in the record at Rec. Doc. 3, Exhibit L.

It is true that the McGary, Parker, Badon, Bentley, and McCray gave different accounts as to what transpired after the shooting.  McGary testified that he was not at the scene when the shooting occurred but was instead at a different location parking the gray El Camino.  He further testified that, after the shooting, petitioner returned to the vehicle carrying a gun.  However, the testimony of Parker and Badon seemed to indicate that McGary and the vehicle remained on the scene, in that they testified that petitioner began shooting almost immediately upon emerging from the vehicle.  Bentley and McCray's statements also seem to indicate that the gray vehicle remained on the scene, but they stated that, after the shooting, *three or four* men ran toward the vehicle.

As a preliminary matter, the Court notes petitioner does not offer any evidence, such as an affidavit from trial counsel, that the statements of Bentley and McCray were in fact withheld in this case.  Such an omission of any evidence on the initial prong of the Brady inquiry is, in and of itself, fatal.   See Harris v. United States, 9 F.Supp.2d 246, 275 (S.D.N.Y. 1998) ("[T]he government does not bear the burden of establishing that documents were not withheld; it is [petitioner's] burden to prove that the government failed to disclose evidence favorable to [him].), aff'd, 216 F.3d 1072 (2nd Cir. 2000); see also United States v. Avellino, 136 F.3d 249, 261 (2nd Cir. 1998); Cruz v. Artuz, 97-CV-2508, 2002 WL 1359386, at *14 (E.D.N.Y. June 24, 2002).  However, even if the Court assumes that the statements were withheld, petitioner's claim still fails for the following reasons.

Although the statements of Bentley and McCray cast doubt on McGary's statement that he was not actually on the scene when the shooting occurred, that is not new information.  At trial, the testimony of Parker and Badon indicated that McGary was still present, not parking the

vehicle, when the victim was shot.  Therefore, this information from Bentley and McCray was cumulative at best.  See United States v. Gonzales, 121 F.3d 928, 946 (5th Cir. 1997) ("[T]here is no Brady violation where undisclosed evidence is merely cumulative.").  More importantly, McGary's questionable veracity was clearly established, not only by the testimony of Parker and Badon, but also by McGary's admission on the stand that he lied in *both* of the statements he gave to the district attorney.  Further, the fact that McGary may actually have been on the scene is immaterial on the critical issue here, i.e. who shot the victim.

Arguably, the information from the statements which might have been more helpful to the defense is that, after the shooting, Bentley and McCray allegedly saw three or four men flee toward a gray vehicle, presumably the El Camino supposedly used as the getaway car.  Even if it assumed that one of the men was petitioner, that leaves two or three other men not previously mentioned by McGary, Parker, or Badon.  However, Brady is not violated simply because potentially *helpful* information is withheld from the defense.  See Kyles v. Whitley, 514 U.S. 419, 436-37 (1995); Wyatt v. Dretke, 165 Fed. App'x 335, 341 (5th Cir.), cert. denied, 127 S.Ct. 19 (2006).  Rather, as previously noted, Brady and its progeny require only that the prosecution produce *exculpatory* or *impeachment* evidence.  The information here clearly is not exculpatory, in that neither Bentley nor McCray, who did not arrive on the scene until *after* the shooting, had *any* information as to who actually shot the victim.  Nor could the information technically be used to "impeach" McGary, Parker, or Badon, and the mere failure of the prosecution to reveal the identities of nontestifying witnesses is not itself a Brady violation.  See Wheaton v. Roe, 101 Fed. App'x 648 (9th Cir. 2001).  Further, and most importantly, the Court simply cannot say that the failure to

disclose these largely irrelevant statements puts the whole case in such a different light as to undermine confidence in the verdict.

In summary, petitioner simply has not shown that the state court decisions rejecting petitioner's <u>Brady</u> claim were contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. Accordingly, applying the AEDPA's deferential standard, this Court likewise rejects that claim.

<u>Improper Jury Verdict</u>

Petitioner contends that he was wrongly convicted because, when the jury was polled after the verdict, one juror, Mary Kraemer, indicated that she in fact voted not guilty.

Petitioner was charged with and convicted of second degree murder. Louisiana law provides: "Whoever commits the crime of second degree murder shall be punished by life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence." La.Rev.Stat.Ann. § 14:30.1(B). Louisiana law further provides: "A case in which the punishment is necessarily confinement at hard labor shall be tried before a jury of twelve persons, ten of whom must concur to render a verdict." La. Const. art. I, § 17(A); <u>see also</u> La.C.Cr.P. art. 782(A).

The transcript reflects that, when the jury was polled, two jurors, including Mary Kraemer, indicated that they did not vote to find petitioner guilty. However, the remaining ten jurors indicated they the did vote to find him guilty.[29] Therefore, the record therefore reflects that ten

---

[29]   State Rec., Vol. III of III, trial transcript, pp. 503-04. Two women on the jury had the surname of Kraemer. The transcript reflects that Barbara Kraemer voted guilty, while Mary Kraemer did not.

jurors concurred in the guilty verdict as required by Louisiana law.  According, petitioner's claim has no merit.

## **RECOMMENDATION**

Accordingly, **IT IS RECOMMENDED** that the petition for federal *habeas corpus* relief filed by Carl Watson be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation contained in a magistrate judge's report and recommendation within 10 days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  Douglass v. United Services Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).

New Orleans, Louisiana, this twenty-seventh day of April, 2007.

**DANIEL E. KNOWLES, III**
**UNITED STATES MAGISTRATE JUDGE**